Filed 7/28/26  In re Z.P. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Z.P., a Person Coming Under the Juvenile Court Law. | B344836 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.M.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 24CCJP03191A) |

APPEAL from an order of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

————————————————

A.M., the maternal aunt and legal guardian of Z.P. (born in 2010), challenges the juvenile court's jurisdiction findings that she emotionally abused Z.P. She contends substantial evidence does not support the findings. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Circumstances Leading to A.M.'s Guardianship of* Z.P.

Z.P.'s mother passed away in 2021. Z.P.'s father (Christopher P.) assumed custody of Z.P. and her twin brother, but he was unable to care for them because he was addicted to drugs, did not have stable housing, and engaged in unsafe criminal activity. Z.P. had not seen her father for several years at the time this case arose. It was later determined he was incarcerated in Indiana.

Z.P.'s other maternal aunt who lived in Georgia initially took over caring for Z.P. and her twin brother, but after two years she refused to pick Z.P. up following Z.P.'s three-week stay at a mental hospital due to self-harming behaviors. A.M. picked up Z.P in Georgia and brought her back to stay with A.M. in California in July 2024. The probate court in Los Angeles County granted A.M. legal guardianship over Z.P. in September 2024, a month before Z.P. turned 14.

B.    *Z.P.'s Detention from A.M.*

The month after becoming Z.P.'s legal guardian, A.M. called in a referral to the Los Angeles County Department of Children and Family Services (the Department). She stated Z.P. had mental health issues and cutting behavior, abused marijuana, had drug dealers come to the guardian's home, stole the guardian's alcohol, and had outbursts. The guardian stated

2

she could no longer manage Z.P.'s behavior and feared for Z.P.'s and her own safety. Z.P. had just received a psychiatric evaluation, and the guardian disagreed with the hospital's assessment that Z.P. did not meet the criteria for an involuntary hold. A.M. did not want to take Z.P. home from the hospital that day. She requested the Department intervene. The Department detained Z.P. and placed her in emergency foster care when A.M. refused to pick up Z.P. after she was discharged.

C.  *The Department's Dependency Petitions and A.M.'s Petition To Terminate Guardianship*

The Department filed a petition asserting the juvenile court should take jurisdiction over Z.P. under Welfare and Institutions Code section 300, subdivision (b),[1] because A.M. was unwilling and unable to provide Z.P. with ongoing care and supervision; A.M. had refused to pick up Z.P. after she was discharged from the hospital; and Z.P. told the Department she did not feel safe with A.M. and did not wish to return to her custody.

In November 2024, A.M. filed a petition to terminate the guardianship in the dependency court. The petition stated, "It is in [Z.P.]'s best interest to terminate the guardianship to insure a comfortable home environment and access to treatment and services."

In February 2025, the Department amended the juvenile dependency petition to add an allegation, under both subdivisions (b) and (c) of section 300, that A.M. had emotionally abused Z.P., including by telling her negative things about her father, yelling at and speaking negatively to her, blaming her for her mental

---

[1]  Statutory references are to the Welfare and Institutions Code.

health issues and other circumstances, and making derogatory remarks to others about her.  The petition alleged the emotional abuse caused Z.P. to act out in school, use marijuana, and self-harm by cutting and fighting with others.  The Department also added an allegation as to Z.P.'s father under section 300, subdivision (g), that Z.P. had no parent to provide care, supervision, or the necessities of life.

D.    *Evidence at Jurisdiction Hearing*

A contested jurisdiction hearing was held over nine days in March and April 2025.

1.    *The Department's evidence*

Z.P. reported that while hospitalized in Georgia, she was diagnosed with major depressive disorder and oppositional defiance disorder.  When Z.P. came to live with A.M., she was on the anti-depressant Prozac, which Z.P. believed was helping her.  A.M. took her off of it because she felt it was too harsh for a child.  Instead, A.M. gave her Wellbutrin, which belonged to A.M., but Z.P. did not think the Wellbutrin worked for her Z.P. had a history of cutting.  She also admitted using marijuana often to help her cope.

The day before Z.P. was to attend a 30-day drug treatment program arranged by A.M., she and A.M. got into a big argument.  After Z.P. left the house, A.M. called 911.  A.M. told the emergency responders that she did not want Z.P. anymore.  A.M. also told Z.P., " 'You're the reason your mom died.  You're too much to handle.  You're the reason your dad left you.' "  Z.P. stated A.M. regularly told her that Z.P.'s mother died because Z.P. stressed her out and that Z.P. was going to end up a homeless drug addict like her father.

4

Z.P. was transported to a mental hospital to receive a psychiatric examination. The hospital determined Z.P. did not meet the criteria to be held. However, A.M. was adamant that Z.P. be placed on an involuntary hold. After the hospital determined Z.P. was ready to be discharged, A.M. refused to pick her up, and thus the hospital had to call the Department. Z.P. said she did not want to return to A.M.'s care and did not feel safe with her.

Raquel Salcedo, the emergency social worker who responded to the initial referral, met with A.M. at the hospital. A.M. wanted Z.P. to get mental health services and be placed on a hospital hold that day. She became frustrated and upset when Salcedo advised her the Department would be conducting an investigation into the referral. Salcedo stated Z.P. denied being emotionally abused and was willing to go back to A.M.'s home at that time.

When the Department interviewed A.M. one month after Z.P.'s discharge from the hospital, A.M. was hesitant to accept Z.P. back into her home, due to Z.P.'s constant lying, refusal to follow the rules, and unaddressed mental health and substance abuse issues. A.M. denied she refused to pick up Z.P. after her psychiatric examination. A.M. indicated she had done nothing wrong and was not willing to go through the dependency court process to regain custody of Z.P. A.M. was upset that she had been "demonized" after going out of her way to help Z.P., including getting her psychological help and substance abuse treatment.

Alfreda B., Z.P.'s foster parent for the first three months after Z.P.'s detention, testified at the jurisdiction hearing. While Z.P. lived with her, Alfreda observed that after speaking with

A.M. on the phone, Z.P. would become very agitated and depressed, curse, vape inside the house, "just spiral[] out," and would "go into a deep … dark place and disrespect the household." The two would "argu[e] back-and-forth on the phone for two or three hours.… [I]t just took [Z.P.] back to a dark place where she didn't want to be." There was a correlation between Z.P. getting upset with A.M. and then getting high. Z.P. and A.M. would "cuss each other out, she hangs up on her, she gets high then she comes back here with an attitude." The phone calls with A.M. were not good for Z.P.'s mental health because A.M. would yell and lecture Z.P. about how no one wanted her and how "she's 'too much trouble for anyone to take care of.' " Alfreda had reported earlier that A.M. told Z.P. that Alfreda was taking care of Z.P. only because Alfreda was receiving $100,000 to do so. Z.P. cut her wrists and told the social worker she was " 'overwhelmed with everything going on.' "

Alfreda denied that Z.P. ever told her that she used marijuana because of A.M. Z.P. was cutting her arm because of her frustration from being away from her parents and because she was depressed.

Z.P. testified that she liked living with A.M., that A.M. provided her with food and clothing, and that A.M. tried to connect her with a therapist and was involved with her school. Z.P. denied A.M. blamed her for her mother's death, and she denied telling a social worker that.

However, Z.P. testified that after some of her conversations with A.M. while living with Alfreda, Z.P. felt "very drained … and not loved." When asked how she felt when A.M. brought up the court case in conversations with her, Z.P. replied, "I don't know. That's the only thing she can talk about … not other things, not

6

like what's going on in your life." When asked if she ever hurt herself because of A.M., Z.P. testified, "Um, not because of her. Just the way she would act towards me some ways" when they had a disagreement.

Alfreda requested Z.P. be removed from her care in January 2025 due to her continued marijuana use. During this time, A.M. continued to contact Z.P., talk badly about Z.P., and blame her for various things such as the court's order that visits between them occur only in a therapeutic setting. When the social worker asked Z.P. if she felt it was healthy to visit with A.M., Z.P. said she was willing to try but was not sure because it was upsetting that A.M. always blamed her.

In late January 2025, Z.P. was moved to a new foster placement. Z.P. testified that since moving closer to where A.M. lived, she was having good visits with A.M., and she enjoyed them when A.M. was not talking about the court case. Z.P. denied that talking to A.M. made her want to vape. Z.P. said she was ready to move back with A.M. because she did not like being in the foster system.

However, social workers who had recently monitored visits continued to observe problematic behavior by A.M. For instance, during a visit at the mall on April 2, 2025, A.M. made Z.P. very upset by telling her that Z.P.'s twin brother was mad at her. A.M. also (falsely) told Z.P. that Z.P. was coming home with her the next day, which Z.P. later expressed being nervous about. Afterwards Z.P. said she wanted to return to A.M. eventually, but not at that time because A.M. needed to acknowledge her part in why the court case began.

Another social worker testified that when she had recently monitored a visit between the two, A.M. discussed the court case

7

with Z.P. despite the social worker's efforts to redirect her, and yelled at the social worker and called her a liar. The worker also learned A.M. had spoken badly about Z.P.'s father to Z.P. and told her the court was going to send Z.P. to jail. According to a report from the Department, after Z.P.'s testimony at trial, A.M. told Z.P. that Z.P. would go to jail for lying in her testimony, which made Z.P. distraught. The social worker believed A.M.'s behavior was emotionally harming Z.P.

Despite court orders that A.M.'s communications with Z.P. be monitored, Z.P. told the social worker that A.M. frequently messaged her over social media. She showed the social worker the most recent message saying: "Your Attorney and the Dept playing a game and they are attacking me and they are the ones that WILL cause me to walk away.... When you kept telling them you don't want to talk to me, see me or not ready to go back with me What do you think they are going to think??!! That I must be doing something or something is going on serious to make you feel that way and it has to be my fault! So they try to blame me for Everything. And IM NOT HAVING IT. ... To be honest, I was advised by [the Department,] My Dependency Lawyers, my civil suit lawyers that you'll probably be passed around the system just based on history and how the system works. That really upsets me. Actually I'm terrified of this. I don't scare easily but I know how these things go. You are strong but even the strongest have a hard time navigating [the Department] and Foster Care and the effects years after. Foster care is not a good place for kids and especially teens/young adults. I'm doing my Best to stay involved but you see … it's about beating me and punishing me and I'm just not phased nor letting up off their necks."

The Department expressed concern that "continued stress from Court proceedings, negativity from [A.M.] about service providers trying to help the youth, broken promises, threats of walking away from her, threats of lawsuits and [Z.P.] going to jail, interference with service appointments, school and basic needs getting met, and the failure of [A.M.] to reflect upon her part in the situation" constituted emotional abuse that was leading Z.P. to continue self-harming behaviors and vaping.

2.  *A.M.'s evidence*

a.  *A.M.'s testimony*

A.M. testified that after bringing Z.P. to Los Angeles, the two were together every day, sight-seeing, shopping, going out to eat, talking, listening to music, and laughing. She noticed a sadness in Z.P. and knew Z.P. was using marijuana, so she researched drug facilities and got Z.P. to agree to go to an in-patient treatment facility. Z.P. told her she had a history of self-harm and showed A.M. her fresh cuts, and A.M. set up therapy for her and researched options for grief counseling. A.M. also got involved at Z.P.'s school, asked for conferences with school personnel when she learned Z.P. was being bullied, and attempted to get Z.P. involved in extracurricular activities. She instituted and tried to enforce rules for Z.P. at home.

A.M. testified about the events surrounding Z.P.'s psychiatric evaluation that led to Z.P.'s detention. A.M. stated she was led to believe by the attending psychiatrist that Z.P. would be placed on a seven-day hold. The hospital then falsely claimed A.M. refused to pick up Z.P. A.M. waited at the hospital for 16 hours, and then while she was gone picking up food for Z.P., the Department took Z.P. away.

A.M. adamantly denied ever telling Z.P. that Z.P. was to blame for her mother's death. A.M. testified it was Z.P.'s other aunt who stated Z.P. was to blame for her mother's death, and the Department twisted it to make it seem like A.M. had said it. A.M. stated she would tell Z.P. that given her father's drug addiction, Z.P. had a propensity to develop a drug habit.

A.M. testified that after Z.P.'s detention, her visits with Z.P. went great, with the two laughing and talking, and A.M. bringing Z.P. gifts and food. However, the visits became pressured because the social workers monitoring the visits would provoke her and bait her into arguing with them. She acknowledged telling Z.P. that she had reported Z.P.'s attorney and the Department's attorney to the state bar, but she did not believe that was "discussing the case," and she did not think Z.P. cared.

A.M. stated she was not interested in doing conjoint therapy with Z.P. under a court order. She had not engaged in any services offered by the Department because "there was no need." She stated she would withdraw her petition to terminate guardianship if the dependency petition was dismissed, but if it was not dismissed, A.M. was not willing to be ordered to take programs; she could do them on her own.

b. *Documentary evidence*

The court admitted a number of exhibits offered by A.M., including hospital records from October 2024 indicating Z.P. appeared to meet the criteria for acute inpatient psychiatric hospitalization, and supporting A.M's contention she returned to the hospital and spoke with hospital staff after Z.P. was discharged. The court admitted two declarations by A.M. In the first, A.M. stated she believed she had been the victim of

discrimination and retaliation. She stated that in October 2024, she asked the police to release Z.P. to her but they took her to the hospital; then she was treated unfairly by the hospital staff while advocating for Z.P. to get the proper treatment. The second declaration stated that A.M.'s involvement with Z.P. was motivated by love, care, and a sense of responsibility, but the Department and the hospital staff had attacked her. A.M. asserted that when she left the hospital in October 2024 to initiate the call to the Department, the hospital erroneously assumed she was leaving. A.M. stated Z.P. had contacted her outside of the monitored visits, apologized, and stated she wanted to live with A.M.

The other exhibits consisted of text messages between A.M. and the social worker, and text messages from Z.P. to A.M. regarding problems with her foster placement and stating Z.P. wanted to return to A.M.'s home and would do better.

3. *Closing arguments and the court's findings*

Z.P.'s counsel and the Department urged the court to sustain all the allegations in the dependency petition. Z.P.'s counsel argued that even if Z.P. herself did not blame A.M., a 14-year-old who has experienced tremendous trauma may not be able to discern the cause of her distress. But Alfreda and various social workers had "personally observed the negative and detrimental impact that [A.M.]'s behaviors and statements had on [Z.P.]'s mental health and emotional well-being." Further, A.M. continued "to place blame on everyone around her rather than taking accountability for her own actions and the impact they have on those around her, particularly on [Z.P]." Z.P.'s father joined in recommending the court sustain the allegations pertaining to A.M.

11

A.M. argued everything she did was out of love and caring for Z.P., and she had been proactive since rescuing Z.P. after Z.P.'s other aunt in Georgia abandoned her. A.M. initiated contact with the Department and worked to ensure Z.P. got the treatment she needed when she was taken for a psychiatric evaluation. The treating psychiatrist told A.M. that Z.P. would be held at the hospital, so A.M. was upset and confused when she received a phone call at 4:00 a.m. telling her Z.P. was being discharged. A.M. responded appropriately when she said Z.P. needed to stay at the hospital to get services. A.M. was ready, willing, and able to care for Z.P.

A.M. argued she was not to blame for Z.P.'s trauma and behavioral issues stemming from the death of her mother. A.M's attempts to enforce rules to keep Z.P. safe did not constitute emotional abuse. A.M. noted the Department failed to connect Z.P. with services after her detention to help her address her mental health and substance abuse issues.

The court dismissed the count under section 300, subdivision (b), alleging that A.M. was unwilling to care for Z.P., and the count under section 300, subdivision (g), alleging Z.P. had no parent to provide care, supervision, or the necessities of life. The court sustained the allegation under section 300, subdivisions (b) and (c), that A.M. had emotionally abused Z.P.

The court adopted the arguments of Z.P.'s counsel as the court's findings and made additional findings. The court concluded that, except for her testimony about how she cared for Z.P. and would be willing to care for her again, A.M. was not credible and her testimony was replete with contradictions. The court determined Z.P. came to A.M. with substantial trauma and that A.M. loved Z.P., wanted the best for her, and would serve as

12

a strong advocate. However, the court found A.M.'s actions did "not ameliorate but instead exacerbated [Z.P.'s] trauma." The court found A.M's "actions are largely if not entirely the cause of Z.P. continuing to suffer emotional damage. Her actions cause distress and unnecessary conflict in the adults involved in this case, let alone a child with very fragile and volatile mental health." The court found that credible testimony from all the social workers and Alfreda demonstrated that "despite being warned about concerns over sharing case details with [Z.P.], [A.M.] continues to do so and blames [Z.P.], [Z.P.]'s counsel, the caregivers, [and] the [Department] staff, rather than look at her own actions. Also, [Z.P.] is confused by [A.M.'s] conflicting statements that on one hand she wants her back. On the other hand, she wants to be rid of her. [¶] Furthermore, [Z.P.] does not know whether to believe [A.M.] that the [Department] is not looking out for her and lying about the caregivers and [A.M.'s] statements." The court found Alfreda credibly testified about her observations that Z.P. would be depressed after each call when A.M. told her information about the court case. In addition, Z.P. credibly testified that she felt drained and not loved after her calls with A.M., and she had engaged in self-harm due to the way A.M. acted toward her during their disagreements.

The court concluded Z.P. suffered from serious symptoms as a result of the emotional abuse, including depression and aggressive behavior towards herself and others, including cutting herself, using drugs, and getting into fights.

At the disposition hearing that took place several weeks later, the court ordered Z.P. removed from her father's physical custody and granted him family reunification services. Z.P. confirmed that at that time she did not wish to live with A.M.

13

The court granted A.M.'s petition to terminate the guardianship without objection,[2] and denied her request to vacate the jurisdiction findings.

A.M. timely appealed from the disposition but challenges only the jurisdiction findings.

## DISCUSSION

A.   *Substantial Evidence Supported the Juvenile Court's Exercise of Jurisdiction Under Section 300, Subdivision (c)*

   1.   *Standard of review and relevant authority*

"In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings …, we examine the record in the light most favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses.  [Citation.]  We ' " 'do

---

[2]   The parties do not address whether this appeal is moot because the voluntary termination of A.M.'s guardianship means Z.P. will not be returned to A.M.'s custody as legal guardian even if we determine the court erred in taking jurisdiction.  (See *In re D.P.* (2023) 14 Cal.5th 266, 276 ["A reviewing court must ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding." ' "].)  However, A.M. proceeded with her petition to terminate the guardianship only because the court had already sustained the relevant allegations in the petition.  If we determined the court improperly sustained those allegations, the record suggests it is possible A.M. would petition again for guardianship of Z.P.  Accordingly, we exercise our discretion to reach the merits of the appeal.  (See *D.P.,* at p. 282 [even where an appeal is moot, "courts may exercise their 'inherent discretion' to reach the merits of the dispute"].)

14

not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " ' [Citation.] We uphold the juvenile court's findings unless they are ' " 'so lacking in evidentiary support as to render them unreasonable.' " ' [Citation.] If there is substantial evidence to support the court's order, we must uphold it even if other evidence supports a contrary conclusion." (*In re E.G.* (2025) 112 Cal.App.5th 707, 721; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633.) " 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*In re E.G.*, at p. 721.)

Section 300, subdivision (c), applies where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." " 'The statute thus sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment.' " (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 22.)

The court found A.M. was the cause of Z.P.'s continuing emotional harm. "The parental conduct branch of [section 300,] subdivision (c) seeks to protect against abusive behavior that results in severe emotional damage," i.e., "abusive, neglectful and/or exploitive conduct toward a child which causes any of the

15

serious symptoms identified in the statute," not "run-of-the-mill flaws in our parenting styles." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 559.) " 'In a situation involving parental "fault," the [Department] must prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior.' " (*In re Roxanne B.* (2015) 234 Cal.App.4th 916, 921.)

A.M. argues substantial evidence is lacking for all three elements. We conclude otherwise.

> 2. *Substantial evidence supported the court's finding of offending conduct by A.M.*

A.M. contends substantial evidence did not demonstrate emotionally abusive conduct. She notes that Z.P. testified she liked living with A.M., and she wanted to go back to living with her. A.M. also relies on Z.P.'s testimony that it was her aunt in Georgia, not A.M., who blamed Z.P. for her mother's death.

However, this argument ignores Z.P.'s testimony about the negative effects of her contact with A.M. Z.P. testified that her conversations with A.M. while living with Alfreda left Z.P. feeling "very drained … and not loved." Z.P. stated A.M. only talked about the court case and never about what was going on in Z.P.'s life. Z.P. testified that she would sometimes engage in self-harm because of the way A.M. acted toward her when they had a disagreement.

Moreover, even if Z.P. did not blame A.M. for exacerbating her emotional problems, the court credited the testimony of Alfreda and several social workers who personally observed that A.M.'s behaviors negatively affected Z.P.'s mental health and emotional stability. (See *In re C.L.* (2025) 116 Cal.App.5th 53, 67

16

["we defer to the juvenile court's credibility findings"].)  These problematic behaviors included refusing to pick up Z.P. when she was discharged after her psychiatric evaluation, blaming Z.P. for the Department's involvement, sending Z.P. inappropriate messages including that she might "walk away," fixating on the court case when talking with Z.P., suggesting Z.P.'s caregivers and the Department did not care for Z.P., and refusing to accept any responsibility for her actions or to engage in any services to assist her in parenting Z.P.  While some of Z.P.'s statements could support a finding that A.M. did not emotionally abuse Z.P., our review for substantial evidence asks only whether there is sufficient evidence in the record that *does* support a finding that A.M. engaged in emotionally abusive behavior.  (See *In re E.G.*, *supra*, 112 Cal.App.5th at p. 722 [parent's arguments on appeal "demonstrate the juvenile court could have resolved the evidentiary and credibility conflicts differently, but they do not show there was no substantial evidence to support the findings"].)  The record contains such substantial evidence.

3.  *Substantial evidence supported the court's finding of a nexus between A.M.'s conduct and Z.P.'s serious emotional harm*

A.M. also contends there was no evidence that A.M.'s behavior during phone calls, messages, and visits caused Z.P. serious emotional harm.  She argues Z.P. exhibited the same symptoms before A.M. began caring for her—such as cutting herself and smoking marijuana to cope—and thus A.M. did not cause her issues.  She further relies on Z.P.'s testimony that A.M was not the source of her issues.  For instance, Z.P. testified she did not use marijuana because of A.M.

17

A.M.'s argument again disregards the unfavorable evidence. The court found Alfreda credibly testified she observed a direct correlation between Z.P.'s phone calls with A.M. and Z.P.'s "spiraling" behaviors afterward, when she would act depressed, vape, and get into fights with others. Z.P. also admitted to cutting herself after having disagreements with A.M. And the social workers who monitored in-person visits reported A.M. made Z.P. distraught, for instance by telling Z.P. that her twin was angry at her. Thus, substantial evidence supported the court's conclusions that A.M.'s actions did "not ameliorate but rather exacerbated [Z.P.'s] trauma," and that A.M's "actions are largely if not entirely the cause of [Z.P.] continuing to suffer emotional damage." (See *In re Roxanne B.*, *supra*, 234 Cal.App.4th at p. 923 [even if child's depression initially was caused by something else, jurisdiction under subdivision (c) of section 300 was appropriate where parent's conduct caused child's depression "to worsen and persist"].)

Finally, A.M. contends there was no evidence Z.P. experienced the serious symptoms that justify jurisdiction under section 300, subdivision (c), i.e., "severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others." (§ 300, subd. (c).) A.M. is wrong. Continued acts of self-harm, such as cutting, constitute aggressive behavior toward oneself and are an outward sign of serious emotional distress. Contrary to A.M.'s assertion, *Nahid H. v Superior Court* (1997) 53 Cal.App.4th 1051 does not stand for the proposition that an expert evaluation is generally necessary to establish the serious emotional harm element under section 300, subdivision (c). In that case, the court merely noted the record provided "little support" for the allegation under section 300, subdivision (c), and

18

the record was "remarkable for the absence of psychological evaluations or structured therapy involving the mother or the minors to ascertain and ameliorate the causes of the estrangement between them." (*Nahid H.*, at p. 1070.) Unlike *Nahid H.*, here it was self-evident from Z.P.'s cutting behaviors that she was suffering severe emotional harm.[3]

## DISPOSITION

The judgment is affirmed.

STONE, J.

We concur:

SEGAL, Acting P. J.

FEUER, J.

---

[3] A.M. also complains the juvenile court improperly sustained jurisdiction under subdivision (b) of section 300. Because jurisdiction over Z.P. is appropriate under section 300, subdivision (c), we need not examine whether it is also appropriate under subdivision (b). (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979 ["As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate."].)

19